J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Lawrence Schallert*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE SCHALLERT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>STOCKX LLC, a Michigan limited liability company; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

CLASS ACTION COMPLAINT

## **INTRODUCTION**

1.      Defendant StockX, LLC ("Defendant" or "StockX") is a central player within "sneakerhead" culture within the United States – a phenomenon that took root in the Los Angeles area in the late 1980s and for which California is a mecca.  L.A. and the Bay Area contain scores of boutiques hawking prized vintage and iconic athletic footwear, such as Yeezys, AirMaxs, and AirJordans, confirming that California residents make up a recognizable portion of a worldwide market that some analysts believe might have reached $6 billion in annual revenue.

2.      To secretly collect data about the sneakerheads who visit its Website, found at https://stockx.com (the "Website") from California (in addition those visiting from other places), StockX deploys on the Website: (a) code belonging to social media companies X Corp. and Google and (b) data broker software.  The data collected includes information about these Californians' browsing habits (the webpages they visit) and locations; things such as device and browser identity, specifications and settings; and cookieIDs found on the device.  These data are used to track the California-based visitors' activities on the Website as well as elsewhere on the web, and in some instances, their activities even when using a different device from the one they used to visit the Website.

3.      Additionally, the data collected, via the social media company code and/or data broker software, is compiled and correlated with external records that the social media companies, or the data broker(s), possess, in order to learn the identity of California-based users of the Website.

4.      Defendant's installation and use of social media code and data broker software on the Website without obtaining users' consent is a violation of the California Trap and Trace Law.

## **JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total

matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

6. Defendant is a Michigan limited liability company that through the Website sells cult-status and vintage sneakers, streetwear, watches, handbags, electronics and collectibles. Defendant actively markets its products to California businesses and proprietors. It maintains ongoing business relationships with such California customers.

7. Defendant derives substantial revenue from California-based transactions through its operation of the Website. Defendant is a dominant presence in "sneakerhead" culture, and California, particularly the Los Angeles area, is a premier global hub for that culture. Annual events such as Los Angeles Got Sole, Sneaker Con Los Angeles and Sneaker Con Bay Area are held in California. These events, which attract thousands of attendees, celebrate sneakerhead culture and involve sales of vintage and cult-status sneakers and related apparel.[1] Since 2019, Los Angeles has hosted Sneakertopia, a "pop-up museum" that "brings guests along the journey of what started as an article of clothing and turned into a global culture."[2]

8. Further, Defendant specifically intended its surveillance operations to cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

---

[1] *See, e.g.,* https://www.laconventioncenter.com/events/detail/los-angeles-got-sole-2025 (last visited 1/29/2026); https://sneakercon.com/event/sneaker-con-bay-area-october-18-19-2025/ (same); https://sneakercon.com/event/sneaker-con-los-angeles-september-6-7-2025/ (same).

[2] https://sneakertopia.com/museum/ (last visited 1/29/2026); *see also* https://wwd.com/fashion-news/fashion-scoops/sneakertopia-opens-in-l-a-on-oct-1203348402/ (last visited 1/29/2026).

9. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## PARTIES

10. Plaintiff Lawrence Schallert ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

11. Defendant StockX is a Michigan limited liability company that owns, operates, and/or controls https://stockx.com (the "Website"). Through the Website, StockX operates like a stock market for high-demand consumer goods, including sneakers, streetwear, watches, handbags, electronics, and collectibles.

12. Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

13. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

14. Defendant is the proprietor of the Website.

CLASS ACTION COMPLAINT

3

15. The Website, like most other websites, due to code or software programs running on the Website, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices. This ability exists separate and apart from the Data Broker software running on the Website that forms the basis of Plaintiff's claim in this action.

16. Defendant has partnered with at least one registered California Data Broker ("Data Broker," and more than one such Broker, "Data Brokers") in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing at least one Data Broker Software Development Kit ("DBSDK") on the Website.

17. DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through a process called "fingerprinting." The process, conducted by Data Broker, entails ascertaining the identity of a website visitor by plotting hundreds of personal identifiers, including, *inter alia*, cookies or other numbers that are associated with the visitor that can be used for tracking on the visitor's device, the visitor's geolocation, and her device and browser type, settings and specifications.

### Registered California Data Brokers

18. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

19. Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

20. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The

CLASS ACTION COMPLAINT

4

data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

21. Data Brokers share the data and profiles they amass with the website operators with whom they partner, who, like Defendant, facilitate the transmission of visitor data to the Data Brokers. The website operators can use the data to learn the identity of their website visitors and to target them with marketing based on a variety of data about the visitors. The ability to identify individual consumers who are more likely to respond positively to specific online advertising, or online marketing campaigns, represents a commercial and financial boon to proprietors such as Defendant. Thus proprietors selling goods online have a strong incentive to partner with Data Brokers to collect data from the visitors to their websites.

22. Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[3]

23. Defendant has in fact partnered with a Data Broker, Criteo S.A., by installing its software on the Website in order to deanonymize, identify and target Website visitors as prospective customers. The software also allows Criteo to access, use, and monetize the data of visitors to the Website sent to it, in ways that remain opaque to persons not transacting with this Data Broker.

---

[3] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

CLASS ACTION COMPLAINT

**Defendant and Criteo S.A.**

24. Defendant's installation and use of a DBSDK violates.

25. Defendant has, and is, violating the California Trap and Trace law, by installing and deploying the DBSDKs of Criteo S.A. (the "Criteo DBSDK") on its Website.

26. Criteo is a French company that has sustained fines in the millions of Euros by France for breaches of European and French privacy regulations relating to Criteo's failure to obtain required user consent. Criteo specializes in retargeting consumers by utilizing JavaScript "Criteo One Tag" pixels on websites. The Criteo DBSDK functions as follows:

27. It places trackers or cookies on partner websites that a user visits. These trackers assign a unique identifier, called a Criteo ID, to the user's device. It collects other cookie IDs, the IP address, device ad IDs and user agent from the user's device.

28. The Criteo DBSDK then logs browsing events by the user, including products viewed, timestamps (of events), purchases, page URLs and referrer URLs. It also obtains customer relationship management (or CRM) data from website operators that have installed the Criteo DBSDK such as email hashes and offline sales.

29. The Criteo DBSDK performs what is referred to in the Data Broker world as "identity resolution" by matching the information it receives from a visitor to a website, whom the Criteo DBSDK can recognize *across devices*, with offline data.

30. The Criteo DBSDK entails real-time interception of IP/cookie IDs and browsing events.

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

31. Plaintiff visited the Website on September 30, 2025. When Plaintiff did so, their identifying information was sent to Criteo by way of electronic impulses.

32.     The purpose of this transfer of data relating to Plaintiff, from Defendant to Criteo, was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described *supra*) of Plaintiff.  This transfer benefitted Defendant and Criteo commercially and financially.

33.     On information and belief, the Criteo DBSKD took Plaintiff's information and added the information to Criteo's data collection concerning Plaintiff and their devices and browsers.   In turn, Defendant received other relevant data obtained by Criteo regarding Plaintiff.  Criteo was able to use the information regarding Plaintiff's September 30, 2025 visit to the Website to further profile Plaintiff, with the objective of monetizing data about Plaintiff by selling or licensing it to other entities, including law enforcement and government agencies.

34.     The activity of Defendant and Criteo is not necessarily limited to commercial surveillance.  The collection and dissemination of data facilitating the tracking of identifiable individuals by private entities also raises important concerns about non-commercial uses.  A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[4]

35.     There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[5]

---

[4] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[5] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.

CLASS ACTION COMPLAINT

7

Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[6]

36.    The prospect of private entities sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025.  In 2025, Columbia and Brown Universities agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[7]  During the same year, tech companies complied with unprecedented demands for concessions from the federal executive branch.[8]

37.    No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers such as Criteo to the federal government. It is unclear whether Criteo is aware of or concerned with the Constitutional rights of American citizens as it is a French entity.

38.    The only purpose of the Criteo DBSKD is to identify users and then track them on the internet.

39.    The Criteo DBSDK meets the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because it captures signaling information (information revealing who is visiting the website and what they are doing) in order to identify the source of an otherwise anonymous website visit – which such visit

---

[6] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 1/29/2026).

[7] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.

[8] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.

CLASS ACTION COMPLAINT

8

constitutes an "electronic communication" under § 638.50(c) (based on the term's definition in Cal. Penal Code § 629.51(a)(2)).

40.     There is no way for Plaintiff to learn what the Criteo DBSDK did with Plaintiff's data, including what inferences the Criteo DBSDK has gleaned from it, or when, why and to whom Criteo sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

41.     Plaintiff was never informed of, and therefore could not have consented to, data collection by the Criteo DBSDK to achieve commercial and financial goals of Criteo and Defendant.  Plaintiff has no way to know the scope of the injury suffered because Criteo operates in secret and without public disclosure of its operations.

## The Criteo DBSDK Is a Trap and Trace Device\.

42.     CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(c).

43.     Criteo DBSDK effects a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with Criteo to obtain the users' identifying information including telephone numbers.

44.     The Criteo DBSDK is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website.  In fact, the Criteo DBSDK is designed to meet this objective.

45.     Defendant did not obtain a court order before installing or using the Criteo DBSDK on its Website.

46.    Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with Criteo for the purposes of de-anonymization, profiling, and targeting.

47.    Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device.  Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

48.    The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.,* imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see, e.g., Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024) (holding that surveillance software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## CLASS ALLEGATIONS

49.    Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information**
> **was sent to Criteo as a result of visiting the Website within**
> **the limitations period.**

50.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

51.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the

individual circumstances of any Class Member, include but are not limited to the following:

      a.  Whether the Criteo DBSDK is a trap and trace processes as defined by California law;

      b.  Whether Plaintiff and Class Members are entitled to statutory damages;

      c.  Whether Class Members are entitled to injunctive relief; and

      d.  Whether Class Members are entitled to disgorgement of unlawfully obtained data.

52.    TYPICALITY: As a person who visited Defendant's Website and who was fingerprinted and de-anonymized by the Criteo DBSDK, Plaintiff is asserting claims that are typical of the Class.

53.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

54.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law**

**Cal. Penal Code § 638.51 (the "California Trap and Trace Law")**

55.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

56.    The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

57.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

58.    The Criteo DBSDK, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c). The Criteo DBSDK is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

59.    Defendant did not obtain a court order before using or installing the Criteo DBSDK on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the Criteo DBSDK, to identify visitors to its Website.

60.    CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.    An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2.    An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3.    An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.     Statutory damages pursuant to CIPA;

5.     Reasonable attorneys' fees and costs; and

6.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: January 30, 2026                    TAULER SMITH LLP


                                           By: _____
                                                J. Evan Shapiro, Esq.

                                           *Attorneys for Plaintiff Lawrence Schallert*

CLASS ACTION COMPLAINT

13

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: January 30, 2026                    TAULER SMITH LLP


By: _____
        J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Lawrence Schallert*

CLASS ACTION COMPLAINT

14